Honorable Brian Thomas State Representative, 5th Legislative District P.O. Box 40600 Olympia, WA 98504-0600
Dear Representative Thomas:
By letter previously acknowledged, you have requested our opinion on the following question:[1]
Does the state constitution permit the legislature to authorizethe investment of the Permanent Common School Fund?
 BRIEF ANSWER
We answer your question in the affirmative: The state constitution permits the investment of money in the Permanent Common School Fund as authorized in state statute. Our answer is explained in the analysis below.
 BACKGROUND
The Permanent Common School Fund derives originally from the act adopted by Congress to facilitate the admission of Washington and certain other states into the United States. Ch. 180, 25 Stat. 676
(1889) Enabling Act, ch. 180, 25 Stat. 676 (1889). In this Act, Congress granted certain public lands to the States and provided that that"the proceeds from the sale and other permanent disposition of any of the said lands and from any part thereof, shall constitute permanent funds for the support and maintenance of the public schools and the various state institutions for which the landsabove have been granted." Id., Enabling Act, Section § 11, note 2. Washington incorporated this "permanent fund" idea into its constitution by including in the state constitution article XVI, which includes several provisions implementing the intent of the Enabling Act. Article XVI, sections 1 through 4 require that the state trust lands be disposed of for full market value, set forth requirements as to the terms of sale of such lands, limit the rate at which state land may be offered for sale, and limit the size of parcels to be sold and platted. Article XVI, section 5, in its original form, limited the manner in which the proceeds of such lands could be invested. Article IX of the constitution, relating to education, also contains provisions concerning the state education trust lands.
The intent of congress, carried out by the framers of the state constitution, seems clear: the lands in question were granted to the state to produce income for public education.[2] The State was free to sell the land and use the proceeds directly for this purpose, or to invest the principal and apply the interest to the state purpose, or some combination of the two. However, the constitution, consistent with the enabling act, prohibits the legislature from applying the proceeds (principal or interest) to purposes other than those stated in the constitution.
 ANALYSIS
In your request you point out that, at least taken in isolation, article XVI, section 5 of the State Constitution appears to authorize investment of the Permanent School Construction Fund as the legislature may direct. The language of this provision currently reads as follows:
 The permanent common school fund of this state may be invested as authorized by law.
Id.[3] As you point out in your request, however, this provision cannot be read in isolation. On the same day the people approved this amendatory language, they also approved the adoption of Amendment 43, a companion provision that contains the following language:
 The principal of the common school fund as the same existed on June 30, 1965, shall remain permanent and irreducible.[4]
Washington State Constitution, Article IX, § 3 (italics added). Finally, you note that Article IX, § 5 (part of the original constitution) provides that:
 All losses to the permanent common school or any other state educational fund, which shall be occasioned by defalcation, mismanagement or fraud of the agents or officers controlling or managing the same, shall be audited by the proper authorities of the state. The amount so audited shall be a permanent funded debt against the state in favor of the particular fund sustaining such loss, upon which not less than six percent annual interest shall be paid. The amount of liability so created shall not be counted as a part of the indebtedness authorized and limited elsewhere in this Constitution.
Id.
Given these other provisions, your question is whether the constitution somehow prevents or limits the investment of the permanent common school fund, notwithstanding the seemingly permissive language in article XVI, section 5. We will first discuss the "permanent and irreducible" language in article IX, section 3, and will then consider the effect of article IX, section 5 on your questions.[5]
 1. PERMANENT AND IRREDUCIBLE.
For two interrelated reasons, we conclude that the language in article IX, section 3, making the permanent common school fund "permanent and irreducible", does not prevent the investment of the fund so long as the investment is authorized by law and is consistent with the trust principles which apply to the fund in question.[6] First, we conclude that the language in question must be read in harmony with the language approved by the people at the same time, authorizing investment of the permanent common school fund. Second, we conclude that, even taken in isolation, the words "permanent and irreducible" do not preclude investment.
In construing various provisions of the state constitution, our courts follow the same principles they follow when construing potentially conflicting statutes. The courts construe the constitution as a whole and seek to harmonize the various provisions so as to give effect to all of them. State v. Parmenter, 50 Wn. 164, 96 P. 1047 (1908). As with statutes, constitutional provisions are construed so that no clause, sentence, or word is superfluous, void, or insignificant. Washington Economic Development Finance Authority v. Grimm,119 Wn.2d 738, 837 P.2d 606 (1992). Interpreting Amendment 43 to preclude investment of the permanent common school fund would render Amendment 44 meaningless.
As noted earlier, Amendment 43 and Amendment 44 were adopted at the same time and were proposed by the legislature as two items in a single joint resolution. Therefore, it is safe to assume that both the legislature and the voters understood these two amendments to be interconnected. The relationship between the two is clarified by reference to the ballot titles for the two measures. The ballot title for Amendment 43 was:
 Shall [a]rticle IX, section 3, of the state [c]onstitution be amended to establish a common school construction fund to be used to finance common school construction, with funds to be derived from (1) certain proceeds from timber and other crops from school and state lands, (2) certain interest, rentals and revenues from the permanent common school fund and from lands devoted to the permanent common school fund, and (3) such other sources as the legislature may provide?
Voter's Pamphlet 20 (1966). The ballot title for Amendment 44 was:
 Shall [a]rticle XVI, section 5, (Amendment 1) of the state constitution, restricting investment of the state's permanent school fund to national, state, county, municipal or school district bonds, be amended by removing this restriction and thereby permitting the permanent school fund to be invested in such manner as may be authorized by act of the legislature?
Voter's Pamphlet 22 (1966).
From this language, it is clear that the voters understood, and thus intended in approving the two amendments that the previous restrictions on investment of the permanent common school fund would be removed.[7] The text of the proposed amendment and the ballot title both made this fact clear.[8] The "permanent and irreducible language", adopted at the same election, cannot be construed to negate the legislature's authority to invest the principal of the fund.
A more sensible interpretation of "permanent and irreducible" is available. When interpreting constitutional language, the courts will presume that language carries its ordinary and popular meaning, unless shown otherwise. Westerman v. Cary, 125 Wn.2d 277,892 P.2d 1067 (1994). Webster's New Riverside University Dictionary defines "permanent" as "lasting or meant to last indefinitely: enduring." The primary implication of the word "permanent" is that, unlike many other funds in the state treasury, the permanent common school fund is "permanent" as a matter of constitutional, not merely statutory law. Thus, the constitution restrains the legislature from abolishing this fund or changing the purposes for which it was established. Either would require further amendment to the constitution.
The dictionary defines "irreducible" to mean "incapable of being reduced to a simpler or smaller form or amount." Id. As noted earlier, the whole phrase to be construed in article IX, section 3 is "[t]he principal of the common school fund as the same existedon June 30, 1965, shall remain permanent and irreducible." In adopting this language, the people established a baseline — the principal balance as of June 30, 1965, and restrained future legislatures from reducing the balance below that base.[9] Just as the word "permanent" restrains the legislature from abolishing the fund entirely, the word "irreducible" prohibits the legislature from siphoning off portions of the base principal in the fund and using them for purposes other than those for which the fund was established.[10]
It does not follow, however, that an "irreducible" fund may not be invested. The original text of article IX, section 3, both described the common school fund as "permanent and irreducible" while making provision for the use of interest derived from investing the fund. State Const. art. IX, § 3 (original 1889 text). Amendment 43, again, contemplates that the fund will be invested because it makes provision later in its text for portions of the accrued interest in the fund. There is also no basis for arguing that investments after Amendment 43 were still limited to the list contained in prior law. The prior law was clearly superseded by the adoption of Amendment 44, authorizing investment of the common school fund. Accordingly, we conclude that the "permanent and irreducible" language in Amendment 43 must be read together with the investment authorization contained in Amendment 44.[11] The mere choice to invest the money in the fund, or to specify the type of permissible investments, would not be inconsistent with the "permanent and irreducible" language.[12]
 2. LOSSES TO BECOME STATE DEBT.
You also asked us to review article IX, section 5 of the state constitution, which provides that "[a]ll losses to the permanent common school or any other state educational fund, which shall beoccasioned by defalcation, mismanagement or fraud of the agents orofficers controlling or managing the same, shall . . . be a permanent funded debt against the state in favor of the particular fund sustaining such loss. . . ." Id. (Italics added)[13] While this language imposes fairly stringent consequences in the case of certain losses to the fund, it does not follow that the constitution intended to prohibit investment of the fund.[14]
Article IX, section 5 does not require that every loss in the fund in question be a debt in favor of the fund. Instead, only those losses occasioned by (1) defalcation, (2) mismanagement, or (3) fraud of those managing the fund will have this result. Of these three terms, both "defalcation" and "fraud" connote criminal or quasi-criminal conduct — the embezzlement of funds or the use of deliberate deception for purposes of monetary gain. Obviously, the prudent investment of a fund would not amount to defalcation or fraud. The third term, "mismanage", is defined in Webster's New University Dictionary as "to manage badly". Unlike the other two terms, this term connotes not criminal conduct, but incompetence, or management not meeting some relevant standard of skill and prudence.[15]
However, the very possibility of "mismanagement" implies the activity of "management". In its reference to "those managing the fund", this provision of the constitution clearly implies that funds will be managed and invested, either for the purpose of safekeeping or maximizing income, or typically for both purposes. Although the constitution prescribes consequences for bad management, it does not follow that investment is prohibited. In any case, like article IX, section 3, this provision must be read in harmony with article XVI, section 5, which explicitly authorizes investment of the common school fund.[16]
 3. TRUST PRINCIPLES.
Our courts have held that the land trusts set up in the Enabling Act, which included the common school fund, impose fiduciary duties on the state as trustee. County of Skamania v. State,102 Wn.2d 127, 685 P.2d 576 (1984).[17] To the extent not otherwise specified in the instruments setting up the trust (federal law, the state constitution, state statutes, or occasionally even private trust instruments), the common law duties of a trustee govern the management of trust assets. See AGO 1996 No. 11 (common law duties of trustee apply to legislature and state agencies in managing grant lands). For any one of the state trusts, the terms of the trust are contained in some combination of documents, construed in light of the purpose of the trust. Depending on the specific principles involved, the State, acting through those agencies or officers designated by the legislature, has a duty to prudently manage funds and property to meet the stated purposes of the fund. Thus, although the constitution explicitly permits the investment of the common school fund in such manner as state statute may prescribe, these principles require that investments be chosen with reasonable skill and with an eye to accomplishing the stated purpose of the fund.[18]
We conclude that the constitution authorizes the legislature to provide by law for the investment of the permanent common school fund.[19] The investment must meet fiduciary standards as set forth in the specific statutes and constitutional provisions creating the fund as a trust, and such more general common law fiduciary standards as might be relevant in a particular case.
We trust the foregoing will be of assistance to you.
Sincerely,
JAMES K. PHARRIS Senior Assistant Attorney General (360) 664-3027
JKP:pmd
enclosure
[1] The original opinion request was signed by all of the members of the Task Force on School Construction Financing (of which you were the Chair as of the time of the request). Because the membership of the House has changed since then, we will address the answer solely to you, although we will send copies of the opinion to all of the task force members who are members of the current session of the Legislature.
[2] We understand that many of the granted lands were forested. The State's practice has been to retain the ownership of much of the land and periodically to sell the timber to produce income for the trust fund. Other granted lands have been sold, with the proceeds invested to produce school income. AGO 1996 No. 11
contains an exhaustive analysis of the history and legal status of the state trust lands.
[3] Before 1966, the constitution was more restrictive. The original version of Article XVI, section 5 was: "None of the permanent school fund shall ever be loaned to private persons or corporations, but it may be invested in national, state, county or municipal bonds." Amendment 1, adopted in 1894, changed the language to: "None of the permanent school fund of this state shall ever be loaned to private persons or corporations, but it may be invested in national, state, county, municipal or school district bonds." The current language was adopted in Amendment 44 at the November 1966 general election (1965 Ex. Sess. SJR no. 22, part 2, p. 2817).
[4] The remainder of this section lists the possible sources of revenue for the fund in question, establishes the common school construction fund and defines its uses, and provides that for a temporary period ending on July 1, 1967, interest, rentals, and other revenues accruing to the permanent common school fund could be used only for the common schools. The full text of this section is Attachment A. This section was the other part (part 1) of SJR no. 22, 1965 Ex. Sess., and was adopted by the people as Amendment 43 to the state constitution, also at the 1966 general election.
[5] The word "permanent" also appears in the Enabling Act setting the conditions for Washington statehood, in the section granting lands to the state for educational purposes and providing that the proceeds from the sale of the land would "constitute a permanent school fund, the interest of which only shall be expended in the support of said schools." Enabling Act, § 11. We will not separately analyze the Congressional intent behind this language, as it is beyond the scope of your question.
[6] The 1966 amendment applied the "permanent and irreducible" language to "[t]he principal of the common school fund as the same existed on June 30, 1965 ". The following sentence provides for the addition of additional moneys to the fund, above those in the fund on June 30, 1965, but the grammar and context make it clear that the "permanent and irreducible" language applies only to the June 30, 1965 balance, and not to such additional amounts as might be have been added to the fund since that date. It appears that the first sentence of this section prohibits legislative action which would have the effect of reducing the fund below its June 30, 1965 balance, and otherwise does not directly apply. However, trust principles and other language in the constitution or in the state's enabling act may limit the extent to which the legislature could simply "raid" the permanent common school fund, reduce it to its balance as of June 30, 1965, and apply the remainder to other purposes. You have not asked us if this could be done, and we have not researched the question.
[7] The Statement For SJR 22, Part 2, which became Amendment 44, is similarly clear as to the intent behind the measure. It reads, in relevant part, "Now investments are confined to low-yield municipal issues producing as little as 2% interest! SJR 22 Part 2 permits expanding these investments to include governmental revenue bonds, class "AA" corporate bonds, insured bank and savings and loan accounts . . . realizing 4 1/2% interest and more." 1966 Voters Pamphlet at p. 22 (ellipses in the original).
[8] Another intended effect of the amendment was to remove the limitation, as to this particular fund, which prohibits investments of public funds in the stock of private companies. See State Const. art. VIII, §§ 5, 7; art. XII, § 9.
[9] As is clear from the remainder of article IX, section 3, the amended language authorized the legislature to take portions of the fund's revenue sources after June 30, 1965, and certain interest accruing after July 1, 1967, and use these amounts as part of the base for the new common school construction fund, established in the same amendment. Although the amendment left the principal balance as of June 30, 1965 undisturbed, some of the fund's income earned after that date was used to establish a second permanent fund with a different, though closely related, purpose.
[10] Another implication of the "irreducible" language is that the legislature is not authorized to use the principal in the fund if doing so would reduce the fund balance below the "irreducible" constitutional baseline. It follows, in turn, that the only way left for the fund to produce income for the common schools is through investment and use of the interest. If the principal could not be used up, and the fund could not be invested either, the balance in the fund would lie inert — useless for any purpose. The necessary implication of this reasoning is, again, that the legislature intended to invest the principal so the income would provide funding for the stated purpose.
[11] This particular language has not been construed by our appellate courts, nor could we find any case law from other jurisdictions interpreting "permanent and irreducible". In In re Montana Trust and Legacy Fund, 143 Mont. 218, 388 P.2d 366 (1964), the Montana Supreme Court construed a state constitutional provision making certain land grant funds "forever inviolate". The court held that this provision did not invalidate a statute authorizing the sale of trust fund securities at less than face value, where the principal would be temporarily reduced but in exchange for an increase in trust income through purchasing higher-yield securities. Note that the South Dakota Supreme Court reached a contrary conclusion in Schelle v. Foss, 76 S.D. 620,83 N.W.2d 847 (S.D. 1957). The South Dakota decision relies on the apparent intent of the framers of the South Dakota Constitution to be especially careful and conversative in the handling of state funds. Washington does not appear to have a comparable constitutional history.
[12] As discussed more thoroughly below, the "permanent and irreducible" nature of the common school fund may play a role in defining the fiduciary relationship the legislature has with this fund and in assuring that the state follows trust principles in its management.
[13] This provision makes reference to other state educational funds besides the permanent common school fund. We are aware that other educational funds exist, but these are beyond the scope of your question, and we take no position here as to whether the same principles would be applicable to those other funds.
[14] This provision of the Constitution is also in state statute. RCW 28A.515.310.
[15] The existence of "mismanagement" would, of course, be a question of fact in any particular case.
[16] A related question is whether the State would be required constitutionally to restore the fund balance to its June 30, 1965 level if, without mismanagement, defalcation, or fraud, investment decisions led to a decline in the balance below that benchmark. We do not read the Constitution as automatically barring any "dip" in the balance below the constitutional level, just as the Montana court permitted temporary reductions in a "forever inviolate" fund. Montana Trust and Legacy Fund, footnote 10, above. However, trust principles and the constitutionally permanent nature of the fund would likely result in close judicial scrutiny of any investment losses.
[17] It does not follow that the relationship between the state and the beneficiaries of its land trusts is in every respect like that of a private trustee. We read the Skamania case as establishing the broad principle that the state's duties are fiduciary in nature. However, in any particular case, defining the duties of the trustee would require a particularized inquiry into the law governing the trust in question.
[18] By virtue of Amendment 43 (article IX, section 3), the interest earned on the principal in the common school fund is diverted to the common school construction fund. In investing the fund, then, the state has a fiduciary duty to produce income for the construction fund without unreasonably endangering the principal in the permanent common school fund. Both funds are constitutional in their origin, so the state's fiduciary duties are simultaneous to both "beneficiary" funds. If unskillful management sags to the point of "mismanagement" or worse, article IX, section 5 protects against any resulting losses to principal.
[19] The state investment board has the general power to invest "public trust and retirement funds". RCW 43.33A.010. RCW43.33A.140 and other laws set forth the standards to be followed by the board in making investments.